IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| THE FEDERAL HOME LOAN MORTGAGE CORPORATION and FEDERAL HOUSING FINANCE AGENCY, | ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Civ. Action No. 1:12-cv-539-AJT-JFA |
| MORTGAGE GUARANTY INSURANCE CORPORATION, | ) ) ) |  |
| Defendant. | ) ) ) |  |

## MEMORANDUM OPINION

On May 16, 2012, defendant Mortgage Guaranty Insurance Corporation ("MGIC") filed

a lawsuit in the United States District Court for the Eastern District of Wisconsin ("the

Wisconsin action") against the plaintiffs in this action, Federal Housing Finance Administration

("FHFA") and Federal Home Loan Mortgage Corporation ("Freddie Mac"). On May 17, 2012,

after learning of the Wisconsin action, plaintiff Freddie Mac filed this action against MGIC,

which on June 14, 2012 was amended to include FHFA as a plaintiff. Both actions seek a

declaration of rights with respect to the policy limits that apply to FDIC's claims under certain

mortgage insurance contracts issued by MGIC, under which FDIC is an insured. On June 8,

2012, MGIC filed a Motion to Transfer, Stay, or Dismiss Plaintiff's Complaint [Doc. No. 17],

principally on the grounds of the "first to file" rule. The Court held a hearing on this Motion on

June 29, 2012, following which it took the matter under advisement. For the reasons stated

herein, the Court concludes that the "first to file" rule should be observed in favor of the

Wisconsin action and on that basis, this action should be transferred to the Eastern District of

Wisconsin, conditioned, however, on a determination by the court in the Wisconsin action that it may exercise subject matter jurisdiction, as requested by MGIC, notwithstanding the "anti-injunction" provisions of 12 U.S.C. § 4617(f). The Court therefore concludes that its decision to transfer this action to the Eastern District of Wisconsin should be stayed, pending a ruling on FHFA's jurisdictional challenge in the Wisconsin action.

**BACKGOUND[1]**

In 1996, 1997, and 1998, Freddie Mac purchased from MGIC eleven pool mortgage insurance policies (the "Policies"). Under the Policies, loans are insured for a fixed period, typically 10 years, after which time a policy reaches a "sunset" date and coverage under that policy terminates. The Policies are subject to an Aggregate Loss Limit ("ALL") which establishes the maximum amount that MGIC can be obligated to pay under a policy for all losses incurred by Freddie Mac under that policy. The Aggregate Loss Limit is calculated as a percentage of the total initial principal balance "of all the loans insured under this Policy." In 1999, the parties agreed to an endorsement to each of the eleven Policies, entitled the "Mortgage Trust Supplemental Policy Endorsement," under which the ALL for each of the eleven Policies would be replaced with an aggregated ALL that would cover all eleven Policies taken together. In 2007, the Policies started to sunset, and in 2008, MGIC started to reduce the ALL applicable to the surviving Policies by deducting the loan amounts covered under any expired Policies. Freddie Mac learned of this method of calculating the applicable ALL in 2009 and shortly thereafter, challenged the propriety of that methodology under the Endorsement.

---

[1] The facts stated herein are taken from the Amended Complaint filed herein, the Complaint filed in the Wisconsin action, the declarations filed by the parties in connection with MGIC's Motion to Dismiss, Transfer or Stay, and the representations of counsel at the hearing held on June 29, 2012.

On July 30, 2010, MGIC sent a letter to Freddie Mac setting forth its position regarding its interpretation of the Policies and the calculation of the ALL. Freddie Mac indicated that it was undertaking an investigation into and analysis of MGIC's position and on January 7, 2011, Freddie Mac provided MGIC with an update on its investigation. On August 1, 2011, Freddie Mac sent MGIC a letter stating its disagreement with MGIC's position and suggesting an in-person meeting between the parties.

The parties met on September 19, 2011. At that meeting, MGIC was accompanied by its outside litigation counsel. Also at that meeting, MGIC gave Freddie Mac an email dated May 15, 2008, that MGIC claimed supported its position.[2] At the meeting, Freddie Mac took the position that the May 15, 2008 email was inconsistent with the applicable policy language, and in any event, it had not been able to locate any documents supporting MGIC's position, or any evidence that the parties had any discussions about a reduction to the ALL when either the Policies or the Endorsement were issued. At the meeting, Freddie Mac requested that MGIC provide it with copies of any documents MGIC had supporting its position. By an exchange of emails on September 23 and 24, 2011, Freddie Mac advised MGIC that the most relevant documents would be dated from the late 1990s and that once MGIC provided the requested documents, Freddie Mac would renew its investigation into the matter. In October 2011, without any disclosure to MGIC, Freddie Mac also retained outside counsel.

On November 10, 2011, MGIC sent documents to Freddie Mac but did not include any documents from the late 1990s as Freddie Mac had requested. Following receipt of these documents, Freddie Mac continued to investigate but the parties did not have any further

---

[2] The email referred to an "opportunity to perform some degree of [ALL] stepdown," which MGIC contended referred to an agreed reduction to the ALL.

communications until May 8, 2012. During this period between November 2011 and May 2012, Freddie Mac starting drafting a complaint, but nevertheless thought, based on quarterly reconciliation statements it received from MGIC, that there was sufficient coverage under the policies to cover all losses even under MGIC's interpretation of the ALL. That thinking changed when, on April 2, 2012, Freddie Mac determined for the first time that MGIC had stopped calculating the adjustment to the ALL for expired loans at some point in 2011 and that MGIC might begin denying Freddie Mac's claims as early as the second quarter of 2012.[3] Shortly thereafter, in May 2012, FHFA, as the conservator for Freddie Mac, decided for the first time that Freddie Mac should attempt to resolve the dispute with MGIC and that if a resolution could not be reached, Freddie Mac should file its complaint.[4] On May 8, 2012, Freddie Mac sent a letter to MGIC stating that it would like to "set up a brief call (about 30 minutes or so) with you and your outside counsel to discuss the [ALL calculation] issue and to follow-up briefly with you about the documents you sent us." The parties agreed to a conference call on May 16, 2012.

During the May 16 conference call, Freddie Mac, for the first time, advised MGIC that it had retained outside counsel and that it had drafted a complaint, which it was prepared to file if the parties could not resolve the dispute through settlement discussions. Freddie Mac further told MGIC that it was prepared to continue their discussions to resolve the dispute, during which it would respond to MGIC's position and provide documents it had located, but only after MGIC

---

[3] Freddie Mac initially estimated that its claims against MGIC under the Policies exceeded MGIC's calculation of the ALL by approximately $146 million. At the hearing held on June 29, 2012, the Court was advised that this estimate of uncovered losses under MGIC's method of calculating the ALL is now estimated to be approximately $500 million.

[4] FHFA was appointed as the conservator of Freddie Mac in September 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), 12 U.S.C. § 4617 *et seq.*

signed a standstill agreement.[5]  Freddie Mac suggested that MGIC review the standstill

agreement and get back to Freddie Mac in the hopes of being able to meet in the next few weeks.

MGIC and its outside counsel agreed to review the draft standstill agreement and to get back to

Freddie Mac regarding their thoughts on the agreement.  During the conference call, there was,

however, no discussion about whether the parties would agree not to institute litigation while

they were continuing to discuss the standstill agreement.  Freddie Mac did not ask MGIC for

such a commitment and MGIC gave no such commitment.  That same day, following the

telephone conference call, Freddie Mac sent the draft standstill agreement to MGIC.[6]  Upon

reviewing the proposed standstill agreement, MGIC learned for the first time that Freddie Mac

was insisting that in the event of litigation, any lawsuit would be filed only in this Court, thereby

preventing MGIC from filing litigation in its home district in Wisconsin.  On the evening of that

same day, May 16, 2012, at 8:48 p.m. (Central Standard Time), MGIC filed the Wisconsin action

against Freddie Mac and FHFA.  On the following afternoon, May 17, 2012, Freddie Mac filed

this action.

<h3 style="text-align:center">ANALYSIS</h3>

In moving for relief in this Court, MGIC, the defendant in this case and the plaintiff in

the first filed Wisconsin action, relies nearly entirely on the first to file rule, recognizing

implicitly that this case does not otherwise meet the requirements for transfer to the Eastern

District of Wisconsin.  The Court must therefore consider whether the first to file rule requires

---

[5] According to Freddie Mac, there were also general comments by Freddie Mac's business and legal representatives that the parties should be able to resolve their dispute without litigation, and that Freddie Mac wanted to meet again to continue efforts to reach a mutually agreeable settlement, discussing potential times to meet in the future.

[6] The standstill agreement was accompanied by an email that stated: "It is Freddie Mac's hope that we can execute [the standstill agreement] within the next several business days, and then move to resume settlement discussions expeditiously."

that this case be dismissed, transferred or stayed. In making that judgment, the Court must consider not only whether the first to file rule appropriately applies under the circumstances of this case, but also whether there are considerations that would preempt its application. While the parties accuse each other of unbecoming conduct in the lead-up to a nearly simultaneous filing of lawsuits, with each party's filing of a lawsuit prompted by the criticized conduct of the other, a number of factors appear clear to the court surrounding this dispute.

First, the dispute is longstanding. In this regard, the suits relate to contractual rights that have been in place since between 1996 and 1998, depending on the specific mortgage pool insurance policy, a modification to those rights effected by the 1999 Endorsement, and an identified dispute that goes back to at least 2009.

Second, despite some meetings and exchange of documents, there had not been any real substantive settlement discussion before the May 16, 2012 telephone conference, nor had any been scheduled. At most, the parties had adopted a process through which they were exploring whether to engage in substantive settlement discussions. In that regard, MGIC had provided an analysis of its position in July 2010, the parties met in September 2011, and the parties last exchanged documents in November 2011; but there had not been any communications between the parties in the approximately six months following that exchange of documents, until Freddie Mac's request on May 8, 2012 for the telephone conference that took place on May 16, 2012.

Third, although both parties had been preparing for litigation when they agreed to the May 16 conference call, neither party, at any time since the dispute arose nearly three years earlier, had threatened litigation or expressed any intention other than to seek a resolution through the exchange of documents and positions. In fact, Freddie Mac had known that MGIC had involved outside litigation counsel since September 2011 but had never sought, or suggested

6

the need for, a standstill agreement pending efforts to settle their dispute until May 16. For these

reasons, Freddie Mac's position on May 16 clearly suggested a sea change on its part. Freddie

Mac was no longer prepared to engage in the process that the parties had pursued for years

without conditions; and MGIC was faced with what it reasonably understood as an ultimatum to

agree to a standstill agreement designed to give Freddie Mac an advantage in the event that

litigation was necessary, or face the immediate filing of a lawsuit away from its home district.

   The first to file rule is recognized in this Circuit, under which a strong presumption of

priority attaches to the first filed action where the lawsuits are the same or have overlapping

claims. *See Allied-General Nuclear Servs. v. Commonwealth Edison Co.,* 675 F.2d 610, 611 n.1

(4th Cir. 1982); *Ellicott Mach. Corp. v. Modern Welding Co.,* 502 F.2d 178, 180 n.2 (4th Cir.

1974). The purpose of this rule is to promote judicial economy, and to preserve the resources of

both the courts and the litigants. *Samsung Elec. Co. v. Rambus, Inc.,* 386 F. Supp. 2d 708, 724

(E.D. Va. 2005). It also can serve as a bright-line rule that easily resolves what can be a difficult

assessment as far as where competing lawsuits should proceed. The first to file rule is premised,

however, on the assumption that each of the competing actions was a proper action for

appropriate relief, filed to protect the legitimate interests of that party. When the facts establish

otherwise, courts have recognized, based on equitable considerations, that it would be

inappropriate to apply the rule.[7] For these reasons, the Court must first consider whether the two

---

[7] Some courts have referred to these equitable considerations as "special circumstances" while others proceed under the "balance of convenience" test, which essentially conflates with the considerations for transfer under 28 U.S.C. § 1404(a). Although it has expressly adopted the "balance of convenience" test, the Fourth Circuit has not explicitly adopted the "special circumstances" test; however, an unpublished decision from the Circuit suggests that it has implicitly done so. *See Learning Network v. Discovery Commc'ns, Inc.,* 11 Fed. App'x 297, 301 n.2 (4th Cir. 2001) (cited in *Motley Rice, LLC v. Baldwin & Baldwin, LLP,* 518 F. Supp. 2d 688 (D.S.C. 2007), and *Rayder v. AHTNA Gov'tal Servs. Corp.,* 1:05-cv-1251, 2006 WL 335626, at

competing actions, by their substance, are the same or sufficiently similar to come within the rule and, if so, whether each represents a properly filed action for appropriate relief. If those two requirements are met, the Court must then consider whether an exception to the first to file rule applies, as the Plaintiffs in this action contend.

The first consideration is whether the two lawsuits, because of their respective subject matter, fall within the scope of the first to file rule. Here, MGIC's lawsuit – the Wisconsin action – is a declaratory judgment action, seeking a declaration of rights with respect to its liability under a set of insurance policies, specifically, the contractually required method of calculating the Aggregate Loss Limit ("ALL") or, alternatively, asking that the parties' contract be reformed to conform to the parties' contractual intent, which MGIC claims conforms to its interpretation of the Policies and Endorsement. Freddie Mac's lawsuit – this action – seeks both a declaration as to the parties' rights as well as a claim for damages. Although the two lawsuits are not identical, they are sufficiently similar to come within the first to file rule, particularly because, as discussed below, the contract interpretation issues are the same and there have yet to be any demonstrable damages.

Having determined that the Wisconsin action and this action come within the scope of the first to file rule, the Court must next consider whether the Wisconsin action represents a proper filing or nothing more than an exercise in improper forum shopping, made simply in anticipation of an expected action in another district. In order to determine whether a first filed action falls into that category, courts focus on the nature of the first filed suit and the circumstances under which it was filed in order to determine whether the lawsuit was filed for purposes other than its

---

*2 (E.D. Va. Feb. 13, 2006)). In any event, under the facts and circumstances of this case, the Court would reach the same decision under either test.

supposed preemptive effect.

A suit for declaratory judgment, such as the Wisconsin action, filed after notice that an opposing party's own action may be filed imminently, raises what has been called a "red flag" that warrants closer scrutiny of that filing since such a declaratory judgment action, without more, may indicate that the action was merely a preemptive strike rather than an appropriate suit for damages or equitable relief. *See, e.g., Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1007 (8th Cir. 1993) (cited in *Remington Arms Co. v. Alliant Techsystems, Inc.*, 2004 WL 444574, at *3-4 (M.D.N.C. Feb. 25, 2004)). *Cf. Myles Lumber Co. v. CAN Fin. Corp.*, 233 F.3d 821, 824 (4th Cir. 2000) (noting one factor for determining whether to decline to exercise jurisdiction over a declaratory judgment action is "whether the declaratory judgment action is being used merely as a device for 'procedural fencing'"). For this reason, an important consideration in determining whether to follow the first to file rule is whether MGIC's declaratory judgment action was prompted by some purpose other than to claim priority in a race to the courthouse. *See Samsung*, 386 F. Supp. 2d at 724 ("when the circumstances suggest a race to the courthouse, the first to file rule loses much of its force"). If not, then the rationale for the first to file rule dissipates, since that rule is based on the legitimate, but competing interests, of both parties.

Here, MGIC's declaratory judgment action serves some useful purpose other than to preempt Freddie Mac's choice of forum, as the future rights of the parties had yet to be determined and MGIC has not yet definitively acted in a way that would make a declaratory judgment untimely or otherwise inappropriate. For example, MGIC had not yet breached its central obligations to Freddie Mac, that is, the payment of claims; and the Wisconsin action serves a purpose other than simply to adjudicate rights based on past completed conduct. For

that reason, the declaratory judgment action serves a "useful" or "helpful" purpose with respect to the rights and obligations of the parties. *See Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937) ("The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.") (internal citation and quotations omitted) (quoted in *Aetna Cas. & Sur. Co. v. Ind-Com. Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998)); *see also Bartley v. Merrifield Town Ctr. Ltd. P'ship*, 580 F. Supp. 2d 495, 501 (E.D. Va. 2008) (quoting *Quarles*). In this regard, MGIC had just as much at stake as Freddie Mac in resolving how to calculate the ALL since MGIC will soon be forced to act at its peril unless it seeks the assistance of the Court. For this reason, MGIC had legitimate reasons, at least as strong as those of Freddie Mac and FHFA, to file a declaratory judgment action. In short, neither was more of a "natural plaintiff" than the other.

Although prompted by what MGIC learned during the May 16 telephone conference and its subsequent review of the proposed Standstill Agreement, the Wisconsin action was not motivated solely for the purpose of preventing Freddie Mac and FHFA from obtaining their forum of choice.[8] Time was running out before MGIC had to act at its peril, MGIC found itself faced with Freddie Mac's own litigation strategy designed to restrict MGIC's options as well as the parties' ability to continue as they had, and the Wisconsin action was filed in the district

---

[8] Whether the Wisconsin action is a properly filed action also depends on whether the Eastern District of Wisconsin has subject matter jurisdiction over FHFA under 12 U.S.C. § 4617(f). If not, MGIC's action in Wisconsin was not properly filed against Freddie Mac and FHFA and that action, as an improperly filed action, cannot benefit from the first to file rule. As discussed *infra*, the Court defers to the Eastern District of Wisconsin on that issue and decides only which action would otherwise qualify for priority under the first to file rule.

Freddie Mac not doubt would have expected and tried to avoid through the standstill agreement.

Having concluded that MGIC's first filed action serves a purpose other than to preempt a choice of forum by Freddie Mac, the Court must consider whether there exist other equitable considerations that justify an exception to the first to file rule. On this point, Freddie Mac and FHFA contend that MGIC disqualified itself from invoking the first filed rule because it filed the Wisconsin action after stating during the May 16 conference call that it would review the Standstill Agreement and respond to it. In support of this position, Freddie Mac relies on those cases which refuse to apply the first to file rule where the first filed action is filed in the midst of ongoing settlement discussions, as the result of misleading or duplicitous conduct, or in order to avoid a previously selected but now disfavored district after an unfavorable ruling had been issued. *See, e.g., Family Dollar Stores, Inc. v. Overseas Direct Imp. Co.*, No. 3:10-cv-278, 2011 WL 148264, *3-4 (W.D.N.C. Jan. 18, 2011); *Samsung*, 386 F. Supp. 2d at 724 (citing cases); *Remington Arms*, 2004 WL 444574, at *3; *Yoder v. Heinold Commodities, Inc.*, 630 F. Supp. 756, 760-61 (E.D. Va. 1986).

The Court must conclude based on the parties' declarations that neither side misrepresented its intentions, breached any commitments or otherwise engaged in conduct that restricted its ability to file a lawsuit. Freddie Mac's general statements concerning its interest in having the May 16 telephone conference were not inconsistent with its conduct during the conference call. Likewise, MGIC did not breach any commitments or representations made during that call. MGIC's statement that it would get back to Freddie Mac after reviewing the standstill agreement did not constitute an agreement, express or implied, not to file suit. Freddie Mac proposed the standstill agreement without advance notice and without disclosure of its forum selection provision; and under the circumstances, Freddie Mac could not have reasonably

11

assumed that MGIC's limited response, after being caught unawares, was an agreement to restrict its ability to proceed as it deemed appropriate. Clearly, neither party disclosed their overall thinking or objectives, but nothing required them to do so under the circumstances. Each was playing it "close to the vest" after months of not communicating; and while their respective experiences may counsel a higher degree of caution in how they deal with each other in the future, neither party, represented by experienced litigation counsel, requested or gave a commitment not to file a lawsuit pending further discussions, although either could have easily requested such a commitment. Freddie Mac no doubt thought it could continue to rely on MGIC's self-restraint because of its substantial ongoing business relationship with MGIC, the importance of that relationship to MGIC, and the adverse effect a precipitous filing would surely have on that business relationship, as well as the possibilities of an amicable resolution. That Freddie Mac miscalculated does not reflect any impropriety on MGIC's part; and certainly Freddie Mac would not have conceded its inability to establish a priority by first filing a lawsuit had MGIC presented to it the choice that Freddie Mac had imposed on MGIC. In short, both parties simply acted as they thought would protect their interests, without any breach of any commitments or understandings by either side. For all of these reasons, the Court does not find anything in the circumstances surrounding MGIC's filing on May 16 that brings this case within the scope of any equitable circumstances exception to the first to file rule.

Finally, the Court finds no considerations under 28 U.S.C. § 1404(a) that would justify the transfer of the Wisconsin action to this court. MGIC has its home in the Eastern District of Wisconsin and the dispute has some relationship to that district. Freddie Mac and FHFA are subject to personal jurisdiction in the Eastern District of Wisconsin and Freddie Mac and FHFA could have filed this action in the Eastern District of Wisconsin. Neither the "convenience of the

parties or the witnesses" nor the "interest of justice" recommends this District over the Eastern District of Wisconsin. Considerations pertaining to the number or the location of likely witnesses, documents or other sources of proof are in substantial equipoise, as both parties have identified essentially the same number of potential witnesses and sources of proof in their respective districts. The case would likely be resolved more quickly in this District but there is no reason to think that this matter would not be appropriately dealt with in the Eastern District of Wisconsin. As discussed above, the circumstances under which the Wisconsin action was filed do not invoke equitable considerations sufficient to overcome the first filed rule. Overall, maintaining this action here would do nothing more than shift the balance of inconvenience from Freddie Mac in Wisconsin to MGIC in this District.

FHFA and Freddie Mac object to a transfer of this case to the Eastern District of Wisconsin based on the first to file rule on the grounds that under 12 U.S.C. § 4617(f) the Eastern District of Wisconsin does not have subject matter over FHFA in the Wisconsin action. Whether the Eastern District of Wisconsin has subject matter jurisdiction over FHFA does bear on whether it is appropriate for the first to file rule to operate, but that jurisdictional issue is not otherwise before this Court and the Court has concluded that unless the Eastern District of Wisconsin does not have subject matter jurisdiction, this dispute should be resolved in the Wisconsin action. For these reasons, it is more appropriate for the jurisdictional issue under section 4617(f) to be addressed in the Wisconsin action, where FHFA has indicated its intention to directly challenge that court's exercise of jurisdiction. Accordingly, the Court will stay the transfer of this case to the Eastern District of Wisconsin pending a ruling in the Wisconsin action on that issue.

For the above reasons, the Court will grant MGIC's motion to transfer this case to the

Eastern District of Wisconsin based on the first to file rule.  However, given the outstanding

issue with respect to that court's subject matter jurisdiction over FHFA in the competing

Wisconsin action, the Court will stay its order of transfer, as well as all other proceedings in this

case, pending a decision by the court in the Wisconsin action on the jurisdictional issue.

      The Clerk is directed to forward copies of this Order to all counsel of record.

_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
July 5, 2012